## Case No. 53.

ADAMS et al. v. EDWARDS et al.

[1 Fish. Pat. Cas. 1; Merw. Pat. Inv. 650.][1]

Circuit Court, D. Massachusetts. Nov., 1848.

PATENTS FOR INVENTIONS—UTILITY—APPLICATION —ABANDONMENT.

1. Extensive use is evidence of utility.

2. Two structures are "substantially" the same when they are of the same material, if material is important; of the same thickness, if thickness is important, or of the same form, when form contributes to the result.

3. The "invention" is the conception of the idea, not its final development. The law does not mean, by invention, maturity.
[Cited in National Filtering Oil Co. v. Arctic Oil Co., Case No. 10,042.]

4. Where an inventor perseveres in his application for a patent, from first to last, although he may file several successive applications, some of which are withdrawn, his patent can not be defeated, unless upon proof of public use, or sale, for two years before his application.
[Cited in Blandy v. Griffith, Case No. 1,529; Goodyear Dental Vulcanite Co. v. Willis, Id. 5,603; Wickersham v. Singer, Id. 17,610.]

5. The use of a safe, made by one man for himself, and kept by him in his counting-room, or cellar, is a private and not a public use.

6. A patentee may, from patriotism, generosity, despair, or other cause, abandon his patent and invention to the public.
[Cited in Zinsser v. Kremer, 39 Fed. Rep. 114.]

7. Patentees are not bound by their opinions upon legal questions relating to their patents.
[Cited in Bevin v. East Hampton Bell Co., Case No. 1,379.]

8. Fitzgerald claimed "the application of plaster of Paris, in the construction of all iron safes, in the manner above described." Held: That this was a claim for double safes, with a filling of plaster of Paris, three inches thick, poured, in a liquid state, between the double sides of the safe, including the doors, and could only be anticipated by proof of the prior use of a similar combination.
[Distinguished in Bevin v. East Hampton Bell Co., Case No. 1,379.]

In equity. This was an action on the case, [Adams & Hammond against Edwards & Holman,] tried before Mr. Justice Woodbury and a jury, for the infringement of letters patent [No. 3,117,] granted to Daniel Fitzgerald, June 1, 1843, and conveyed by mesne assignments, to plaintiffs. The nature of the invention consisted in interposing plaster of Paris between the inner and outer chests of fire-proof iron safes, after the manner described in the specification.

[1][Reported by Samuel S. Fisher, Esq., and here reprinted by permission. Only partially reported in Merw. Pat. Inv. 650.]

S. P. Staples and B. R. Curtis, for plaintiffs.

R. Choate and Dana & Jewell, for defendants.

WOODBURY, Circuit Justice, charged the jury as follows:

The plaintiffs sue on a patent, which was taken out June 1, 1843, by Daniel Fitzgerald, and assigned to the plaintiffs in that year. Discriminate that, if you please, from every other patent (as many have, on the trial, been mentioned), in order to understand the case thoroughly—a patent issued in 1843, and assigned to plaintiffs, by Benj. G. Wilder, who obtained it from Enos Wilder, who obtained it from Fitzgerald. Now, that patent being so obtained, and assigned to the plaintiffs, no person has a right to use what is described in it, without their permission. They say, that they did not give any permission to the defendants to use it; but that the defendants did use it from 1843 to 1847, and the claim they lay before you is for damages for this use. In order to understand what is in controversy, you will start with the fact, that a patent was taken out in June, 1843.

The next point is, that the defendants have manufactured, used, and sold safes, similar to those described in this patent, for three or four years. That is not in controversy. It is proved by several witnesses, and is not in dispute. Now, that, gentlemen, in point of law, would entitle the plaintiffs to recover for the damages they have sustained, prima facie. They bring here a public document, or grant, made correctly in point of law. Patents are not now issued indiscriminately; and, on the face, it is good, if there is nothing shown against it, and a prima facie case cannot be made out against it. The case becomes narrowed down very much, by the defense, which rests on two great points. These are—First, that notwithstanding the defendants have used this invention, yet, for various reasons, they had a right to use it. And secondly, even though they had not a right to use it, under the law, yet they used it under such circumstances that there should not be any damages given. These defenses you must look into.

Had the defendants a right to use this patent? For if they had, they should not be held responsible; if they had not, they should. Now, gentlemen, as a general principle of law, although a patent thus obtained and thus offered in evidence, as I have said, is prima facie evidence for the plaintiff to recover; yet it is competent for the defendant to show he has a right to use the invention, and he may sustain his defense on various points. He may show that he had a license to use from the party who obtained the patent, and in such a form that he had a right to use the invention. He may show that he has purchased the right—that is, supposing the patent is good; or he may show something to prove that the patent is not good—

1 FED. CAS.—8

as by showing that some other person is the inventor, and not the patentee; or by showing that the thing patented had been in public use for two years before the patent was applied for; or by showing that it had been on sale for two years before, with his consent; or by proving that, from patriotism, generosity, or in despair, or from some other cause, he had abandoned it, so that the other party has a right to use it, and any one may take it up, as a sort of waif, or derelict property. And I mention these points, because they are all relied on for the defense; and being relied on, you must start with the principle of law, that the defendant should, on these, make out his defense, just as you originally started with the principle that the plaintiff must make out his position, or a prima facie case, against the defendants. If the defendants impugn the testimony which the plaintiffs offer, as to the legality or correctness of the patent, you must see how the scale preponderates.

The first argument to prove that this patent is bad, is, because it is for a matter not considered patentable. Now, gentlemen, in order to judge of that, we must first inquire what it is for. I shall instruct you, as a matter of law, that such things are patentable as the discoverer undertakes to apply, in combination, or separately, so as to produce new and beneficial results. We must make some broad and general distinctions of that kind. It need not be a new material. It need not be an entire new machine. It need not be, wholly or throughout, a new application. But when it is a combination, as it is here, it must bring some new feature into the combination, and produce new and beneficial results. And if it does that, it is of no matter how slight is the change. If there is a novelty in the application and in the machine, and if it produces new and valuable results, it is patentable, whether the combination is new, or an important part only, is new. There must be something new in relation to it, and it must produce better results than what were produced before. And when you get novelty in parts or in combination, and novelty in results, and beneficial results, you get what the constitution and laws were enacted to protect: that is, something newly invented, which benefits mankind. It must not be a frivolous object, like the invention of an improvement in making playing-cards, which has been driven out of court because the object was bad.

But in this case the object was laudable— to insure safety to the most valuable articles of property. It was patentable, then, if new and useful.

Next, then, did it produce new and beneficial results? It must have some superior advantages over that which existed before, or it could not produce such results, as to have resisted severe fires, such as consumed former safes, and their contents, without injuring these. Now, gentlemen, in testing

what is a new combination, as I have said, you may not have a new material, but you must have something different, in form or system, from what was used before, and so different as to cause new and better results. Now, as I understand it, safes have long existed before; and such as are called double safes. There had long been some opening between the chests, at some times to be occupied by air, and at other times by substances of various kinds, supposed to be non-conductors—some without and some with the application of such substances to the doors. But what Fitzgerald claims to be new, if I understand it, is, not the use of plaster of Paris to repel fire entirely, in some modes and in some articles, but that it had not been used before in combination with these double chests, applied to both doors and sides, to the thickness with which he used it, in the liquid state, for the purpose of repelling fire. He says, in the patent, it may be used, dry or liquid; but what he expressly relies upon and describes in detail, is the liquid state, and of a certain thickness. As you will see, this has an important bearing upon the result. He uses it for the doors, too, as well as the sides. This patent, then, requires that the safe shall be constructed, under his invention, so as to leave a space of two or three inches —a wider space than has been generally employed before. The preparation shall not be put on merely as a wash, or nailed on like a sheet of mica, or zinc, but it shall be poured in, in a liquid state, to that thickness. I have the impression that this pouring in, in a liquid state, in accordance with the answer to a question which I put to a scientific gentleman on the stand, is a peculiarity in filling all the holes and cracks better, which is essential. For, those acquainted with fires, and their operation upon safes, are aware that one great danger of burning up papers, is in consequence of the external heated air, not flame, being communicated through some small fissures of joints; and that one great means of preventing fire from destroying the contents of the safe, is by reducing the preparation to the liquid form, and pouring it in as a thin paste, so as to be more sure of filling the smallest spaces between the two chests. There may be some advantages from the moisture which comes out during the melting, which may serve to protect the safe from the fire. But it strikes my mind that this result has been brought about, under this invention, not only by using plaster of Paris—which is a good non-conductor, and imbibes, after it is calcined, much water—but by using it in this liquid state, so as to fill up all the crevices; and by having it so very thick, two or three inches, as Fitzgerald had it, instead of (as in the safes which existed before, which you have seen described, and some of which you have seen here) having a mere coat of plaster, half an inch thick. You will at once

see, from your experience, that a coat of two or three inches of matter, thus non-combustible, will resist the progress of a fire much better than a mere wash, or a mere coating of half an inch, or a quarter of an inch. However that may be, he claims it of a certain thickness. He describes the moist state, particularly, for its use, and he applies it to the doors as well as to the other parts. If the doors are not secured, as well as the other parts, it renders the contents quite unsafe. It is, therefore, this new combination of plaster, for this purpose, in this thickness, in the moist state, and applied all around, to the doors as well as to the other parts, which seems to constitute the gist of this discovery—producing such different results as have been shown here—of resisting the largest fires. It could hardly be justifiable, I think, for the court to say that it is not patentable, for want either of importance, apparent novelty, or usefulness. I shall soon, however, suggest something more, for and against its novelty, when considering the special testimony against it under that aspect. I may have said enough as to what is meant by a patent being useful. It must not be frivolous or unimportant. I hardly need dwell upon this. It is a question of fact, as to what is useful, after instructing you, as a question of law, that the patent must be useful. And a jury will have no great difficulty about that. If they find the invention introduced extensively into use, they will conclude that it is useful; for the people will not throw away old articles when old ones are as useful as new, and particularly when they are for the protection of such valuable articles as papers and money. The utility comes home, therefore, to everybody, if the extensive use is made out.

Passing by these you come to the next important part of the defense, and the evidence in relation to which has occupied the greater portion of the trial, and that is: was the improvement, as I have described it to you, made originally by Fitzgerald, or by some other person? This is the special defense, just referred to, against the novelty of this patent. Was there such a machine of the description contained in his specification—was there such a machine invented, or matured, before he did it? If there was, the law says, and says properly, that he cannot succeed, because the world then had the benefit—if it pleased. Another person was entitled to protection on account of it, and to aid the invention it was not necessary to issue this patent. But, in order to test this point, the prior invention must have existed before, with these qualities, with this combination, with this description, substantially. And I do not say, as one of my brethren upon the bench has said, that there is no definite signification to the word "substantial." When we say a thing is substantially the same, we mean it is the same

in all important particulars. It must be of the same material, when the material is important; it must be of the same thickness, when thickness is important; it must be applied in the same way, condition, and extent, to the doors as well as the sides, when either of these circumstances makes an essential difference. If some other machine had all this, as in Fitzgerald's, then it was substantially the same. It is not a matter of moment to make the chest, itself, of one substance, or another, if there is no difference in the period at which they melt, and if they are alike impenetrable to heated air. It may be made of tin, or iron, or brass. It is of no consequence whether it is in form a square or a parallelogram, or whether there is a small mixture with the plaster, which neither vitiates nor improves it. But it must be the same in power to resist heat and exclude heated air, and then, in this particular, it is substantially the same. Change of form is not material, when the form does not contribute toward the new result. When it does, the forms must be alike in all important particulars. As other inventions must have been not only substantially like this, but prior in time, in order to vitiate it, it will be necessary for you to find when Fitzgerald invented this, in order to determine whether he, or others, invented it first. The law means, by invention, not maturity. It must be the idea struck out, the brilliant thought obtained, the great improvement in embryo. He must have that; but if he has that, he may be years improving it—maturing it. It may require half a life. But in that time he must have devoted himself to it as much as circumstances would allow. But the period when he strikes out the plan which he afterward patents, that is the time of the invention—that is the time when the discovery occurs.

Now, it is contended, on the part of the respondents, that there were discoveries, like this, even earlier than in 1830. But in 1830, some of their witnesses say, and others in 1831 and 1832, there were clear discoveries of the use of plaster in this way, and before Fitzgerald started this idea, which he afterward matured and patented. Now, gentlemen, fixing the time of Fitzgerald's invention, you will see whether there were any of that description or not. The plaintiffs contend that this time was in 1830, and they give you the whole history of it, from various sources; among others, from the patentee upon the stand. What led him to the discovery—the experiments he made—the progress in his own mind, and what disabled him—the want of means— from maturing his idea, has been detailed to you. But his attempts continued after making the discovery. By various experiments on the power of plaster, in this way—applied in this form, put on moist, by balls, more in the form of plaster than of paste—

he found that it would stand fire better than anything else. And in this, one of his brothers unites with him, and the testimony shows that he thought early of using it with a safe. He certainly, in 1831, not only made these experiments, but made them with a small box; and he speaks of thinking then that he would get a patent as soon as he could get some person who would assist him. Another brother unites in testifying as to what took place in 1831, and Mr. Loring unites with them in the same. In 1832, he tried it with larger boxes, or safes, with the idea of safes in his mind. And Post, the son—the witness of that name who testified upon the stand—confirms what has been said by others, as to what took place at his father's at that time. The invention was exhibited at the office or house of his father, in New York, in 1832; to Ireland and Yerrick, in 1833. These last testify, with regard to the facts then occurring, of Fitzgerald desiring aid, and wanting to get it, to obtain a patent. In 1834, Mr. Kelsey testifies to experiments, and also in 1835. He says that he made experiments in 1836; and, especially, early in 1836, after the great fire, he went on more extensively in tests, and tried to get persons to unite with him. Mr. Sherwood united with him on that occasion, and did make experiments, which he has detailed here, under oath, with great clearness. The question is then presented, on this evidence, did he strike out this idea, which he afterward got patented, as early as 1831, and did he follow it up to 1836, till maturity, and follow it up, too, in various ways, and with reasonable diligence, considering his means? If you believe that he did, then the question will recur, whether there was any thing earlier of this kind, and to this extent, by others. The first thing that is offered to prove this, is the Conner safe. And here you come, at once, to the thickness of the material used.

You will see its thickness in that safe here before you, and can judge whether it is as well calculated to confer security against fire; and you will next go to the door of it, and see if the door was at all secured against fire; and if neither of these securities existed, as in Fitzgerald's, you will determine whether this would be all the improvement which Fitzgerald accomplished by thickening the material threefold, and applying it to the doors as well as to the sides. But there is another objection to it. It was not made until October, 1830, and Fitzgerald made his experiments previously in that year; in fact, some witnesses say that it was not complete until 1831 or 1832. Passing from these to the French safes—nobody swears that they were here before 1832; some do not swear that the French safes were in this country before 1833 or 1834. The evidence proves them to look ten years old at that time. Although, according to the appearance of them, they

may have been made some years before, were they, in fact, so made, or only much exposed at sea? And were they the same in substance? This is the important inquiry on the point now under consideration. It is very important, under another head, to consider whether their previous use occurred abroad or in this country.

Looking at the similitude, or difference: Were not the nails driven through them—through the plaster and all? Again, as to the substance between the chests: Was it plaster? And was it as thick as this? And were the doors secured like this? All these are considerations which affect the question at issue, and must be made reasonably clear and certain. And that is the reason why you are to decide what Fitzgerald's invention was: for others cannot compete with it, unless they were substantially like it.

I then suggest to you, the safe of Marr. in England. That was not in existence in 1834. And, gentlemen, is there any evidence that Marr's was used with plaster? That was spoken of, in the specification, with feathers and cotton, and almost every nonconductor in existence. If he placed no more reliance upon it than upon feathers and cotton, it would hardly be an invention like this. But it is for you to say whether it was the same, and whether it was used with plaster, liquid or powdered, or ever used with plaster at all. That is a question for you to decide, which I leave entirely in your hands. I do not know of any other safes which, it was contended, interfered with Fitzgerald's, till you come down to where I stop in the examination—to 1836. And then, if you believe he made an application for this patent, which was not afterward abandoned, no other invention would deprive him of priority, made after 1836, or within the two previous years. But if he had made an invention which he abandoned utterly, and did not try to get a patent for, after it was once rejected, and did not resume the attempt after the first trial, by a new application, then his priority, by the first application, fails, and you must look to other applications which were duly followed up, and to other inventions, within two years of them. What did he do, under these circumstances? For there must be an invention by others before his application—there must be a discovery by some other person, before he applied—in order to destroy his originality. You have in evidence, how he did apply in 1836, and what his specifications were. And then you have in evidence—how his first application was rejected in 1836 or 1837, and why it was rejected; how he renewed it again in 1837; how he applied, also, for the desk safe, and succeeded in 1838; and how, after a second rejection of the present claim, he applied again a third time, and how he failed; how it was continued in 1839, and

was amended and kept up, till he, finally, by an appeal, obtained his patent in 1834, [1843.]

The great question is, whether he made an application in 1836, by a specification which was afterward substantially embodied in his patent of 1843; and whether he ever meant to abandon it, after his original application? I instruct you, in point of law, with reference to the rejection, that the proof of abandonment of his application would depend upon two circumstances: whether he meant to give it up—to give all up, with regard to it—or whether, being needy, he gave up, during a short time, for want of funds. You would not trip up a man of genius, who had made a discovery, in consequence of a want of means to prosecute his labors to their final consummation, if you thought he intended to persevere. And even if the application was withdrawn —if he kept it up in his own mind, and meant to keep it up before the patent office, if you think he did not intend to abandon it, and did not, but merely suspended operations till he could get means, then all the other inventions would apply only to two years before 1836. But if he did not then reasonably persevere, nor then mean to, they would apply to two years before 1839, when he had his specification corrected, and persisted in, till he obtained the patent.

I now proceed to the next branch of the defense; it is one admissible by law, and often a very important one to the community; and that is, that Fitzgerald—although his invention was original, and important, and valuable, and applied for in 1836, and persisted in till 1843, and not meant to be abandoned during that time—yet allowed it to be in public use without taking a patent, or without applying for one, for two years before 1836. Now, gentlemen, you will perceive that the law, as to this, depends upon two questions: What is a public use? and, What is two years before the application? If you consider the application of 1836 as never having been abandoned, except for a few months, not renewed from want of means to assist in prosecuting his claim, then the public use must be for two years before 1836. But if you suppose that application was abandoned, then the public use must be two years before it was renewed, so as to avail under the principles already laid down. A "public use" is this: Public use is opposed to private use. If a man has an invention, and uses it privately, and nobody knows of it, then the use of it can not debar another person from inventing or patenting it. What is the evidence of a public use, as opposed to a private use? It need not be a general use by the community; but it must be an open use, however, so that the structure and modus operandi are apparent. But, gentlemen, one evidence of a public use is the manufacture of an article, publicly and openly, for sale; not universally, but still,

publicly—not by one person alone, and for his own private use, but the manufacture of it publicly—the offering of it for sale publicly. If a machine had been offered for sale, or had been manufactured, or had been used by various persons publicly, two years before Fitzgerald applied, his patent would fail. You can easily see the reason for it. A man is not to lie by, and let the public—several persons—use his invention without objection. He is not to lie by, and let persons manufacture the article for sale as if not to be patented; because he thus misleads them. He is not to lie by, and let them be sold in public stores. But, gentlemen, there must be a public use for two years, and a use, too, of the same machine in all essential particulars. Now, was there any use of such a machine before 1836, similar in substance, as to the material parts and arrangements? Or, if you will fix upon some later period than 1836, for the commencement of his valid application, was any other machine in use two years before that later period? The law of 1839, in respect to two years, was passed after the first application. But I instruct you that the law of 1839 applies, on all trials since, to previous cases as well as to subsequent cases. The law has come in, and given two years' use and sale to the inventor, without being barred so as to prevent experiments and trials of machines, to improve them. What next are the previous public uses relied on? The only ones which have any bearing upon this question are the Conner and French safes, which have been already considered partially. Was the use public in these cases, is one chief ingredient under this head. Was such a safe as Conner's used by the community? Was it actually sold in the stores? If there is evidence of it, you will refer to it. But if one man, alone, kept it—made it for himself, kept it in his counting-room, or in his cellar, it would be a private use. And the French safes—as to the use of them, you will judge whether there was any evidence that they were used in this country, or made in this country, or sold in this country—if they were like this in all essentials—which is another question for you to decide.

The defense to which I shall next advert is, that if Fitzgerald allowed these safes to be on sale for two years before his first application, the patent is invalid. There is justice in that. He thus would virtually extend the term for the patent. But, did Fitzgerald give permission to any others than himself or his agents, to use them; or were they on sale in the market before he made his first application? What is the evidence on that subject? If there be none, or none satisfactory, it can not operate against this patent.

There is one other defense, and that is, that this invention was described in books before the discovery of Fitzgerald. I think this must, by the act of congress, be before the "discovery," and not before the application. One of the acts of 1836 speaks of the description in books as being necessarily before the discovery, and the use or sale before the application. As to the description in books, it says, in express terms, that it must be before the "discovery." If I am not wrong, there are books referring to Marr's patents, though that is clearly after this invention or discovery, and referring to the use of plaster as a non-conductor. But do they describe this invention of Fitzgerald's in all its material combinations? If they do not, they are no bar to the validity of this invention. Not to delay any further upon these things, I would say, finally, that if Fitzgerald succeeds in overcoming all this, yet if he, or the plaintiffs under him, abandon this invention to the public, from patriotism, generosity, or any other cause, then they should not trip up any person for using it afterward; for a parent does not often abandon his own child. An inventor does not abandon the fruits of his genius, except from some great cause. Was there any great cause which induced Fitzgerald or Wilder to abandon this invention? Have they acted as though they intended to hold on to it; or, have they, in fact, held on, to get the benefits of it; or have they utterly given it up and abandoned it?

Something has been said as to the opinions of the plaintiffs concerning the validity of their patent. I would state to you, as a question of law, that the plaintiffs are barred by any admissions of facts made by them, unless they were made under a mistake—unless they show that they were entrapped into a confession, or labored under some gross error concerning the facts. But opinions given with regard to the law by parties do not hold them in this way. Suppose a person thinks he is not entitled to a legacy; it makes no difference with the law. Many persons come here with great confidence about the legality or illegality of certain questions; it often turns out that they were very much mistaken. But when a party states a fact, and he does not show that he is under a mistake, we hold him to it; otherwise, the opposite party is deceived, or misled.

The final question upon which I wish to say a few words, is the question of damages. On the one side is the demand that you shall give nominal damages, and on the other that you shall give full damages. And it is perfectly competent for you to give nominal damages only, if you think that the plaintiffs have not been injured, of if you think that the plaintiffs have acted in such a manner that the defendants have been misled. On the other hand, gentlemen, if the defendants have not been misled, but meant to get the use of this safe without paying any thing for it, it would be a circumstance to induce the jury to give full damages, but not vindictive damages. And I sometimes in-

struct a jury to give damages, not only to pay for the injury, but, besides the taxable cost of the suit, to remunerate the plaintiff for the extra counsel fees, and necessary incidental expenses in undertaking it. If the defendants are not inventors, and have not bought of inventors, it is one of those cases where larger damages ought to be given. But if they have been misled by the plaintiffs, it is a case for smaller damages.

In relation to the additional points which have been submitted for instruction, by the defendants, it has been said that the claim in 1839 and 1843 does not extend to the degree of thickness which was, laid down by me, as embraced in the patent of 1843. On that point I would instruct you that he says, at the close, in these words: "I claim the application of plaster of Paris in the construction of all iron safes, in the manner above described, or in any other manner substantially the same." What he says, "above described," as to thickness, is this. He describes a "space between the inner and outer safe of about three inches, which space may be varied a little, but should be the same all around and in every direction." I would instruct you, in point of law, that the reference is to that—to three inches. I had supposed it was only two or two and a half inches; but it is still thicker. He describes it as liquid, too, and then says it may be in that or some other way. The words are these: "I then take plaster of Paris, or gypsum, and having boiled it, or baked it in an oven, and calcined it, and reduced it to a powder, I mix it with water till it is about the consistency of cream, or thin paste, so fluid that it may readily be poured into the space left as above to receive it." He does not say that he wishes to use it in this way, merely. He describes the process which he actually performs as the liquid one. As to the doors, he says: "The inner and outer doors are prepared in the same way." And, "where one door is used, it should be made in the same manner, leaving a like space between the inner and outer crust, or face of the door; and, for a like purpose, should be fitted to the chest, or safe, with great accuracy." Also, "the sides and openings of the doors are to be neatly finished, as in other chests." The question of law is, that when he refers to the "manner above described, he refers to the thickness; to the liquid paste, especially; and to the filling of the doors, as well as the rest of the chest."

As to the application of 1836, the request says that this claim was not there in substance. We must compare this application, and see. In 1836, he used water, but it was with a plaster, rather than a paste; and he says: "Within this, is a coat of a peculiar plaster (to be hereinafter described), one inch and a half in thickness; next within this, is a lining, of any kind of wood, about three-fourths of an inch thick; next another coat-

ing of the plaster, two inches thick; the whole is then lined with wood, covered with sheet-iron, upon which the shelves and apartments are fixed. These various proportions may be varied, to suit the size of the chest, and other circumstances; more or less of the plaster being used, according to the liability of the chest to be subjected to a very great heat, in case of fire." He says that the thickness is a very important ingredient, and that it is important, when the situation is such that the fire is likely to be a large one. Here is gypsum—and water with it, so as to form a plaster—two inches thick in one place, and one and a half inches in another.

It is also said, that if the specification of Marr describes this material, it is sufficient, even if he had made, as he swears, no practical machine with plaster. In his testimony, he says, twice, that he never did make one with plaster. If he describes gypsum, he must describe its use in this way. But he says nothing of its being used as a plaster, or of its being poured in as a paste, and nothing of the thickness.

It is also said that, if Fitzgerald was inactive for three years before 1836, it would imply that he had given up the invention. But you will judge, from the evidence, whether in 1835, 1834, and 1833, he did not make direct experiments, and apply to persons for aid.

Another word as to Matthews. He did not use the word "plaster" at all, and says nothing of thickness. He speaks of "soap-stone, Roman cement, alum or glue." I should hold them to be different from plaster, though they might be non-conductors; and that a patent for them did not cover one for plaster of Paris, to be used in the peculiar form and extent described by Fitzgerald.

You will retire, gentlemen, and settle the facts in dispute, and then apply them to the points in controversy, under the principles of law, as explained by the court.

The jury found a verdict for the plaintiffs.

[NOTE. For other cases involving this patent, see Gayler v. Wilder, 10 How. (51 U. S.) 477; Rich v. Lippincott, Case No. 11,758; Wilder v. McCormick, Id. 17,650; Same v. Gayler, Id. 17,648, 17,649; Same v. Adams, Id. 17,647; Gayler v. Wilder, 10 How. (51 U. S.) 509.]